IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

EDDIE DICKERSON                          )        CASE NO. 1:11-cv-2713
                                         )
                    Plaintiff,           )        JUDGE BENITA Y. PEARSON
                                         )
       v.                                )        MAGISTRATE JUDGE
                                         )        KATHLEEN B. BURKE
MICHAEL J.ASTRUE,                        )
Commissioner of Social Security,         )
                                         )        **REPORT AND RECOMMENDATION**
                    Defendant.           )

Plaintiff Eddie Dickerson ("Plaintiff" or "Dickerson") seeks judicial review of the final

decision of Defendant Commissioner of Social Security ("Commissioner") denying his

application for social security disability benefits.  Doc. 1.  This Court has jurisdiction pursuant to

42 U.S.C. § 405(g).  This matter has been referred to the undersigned Magistrate Judge for a

Report and Recommendation pursuant to Local Rule 72.2(b)(1).

For the reasons stated below, it is recommended that the Commissioner's decision be

**AFFIRMED**.

## I.  Procedural History

Dickerson filed an application for Supplemental Security Income Benefits on August 21,

2009.  Tr. 71, 72, 114-116.  He alleged a disability onset date of August 15, 2002.[1]  Tr. 114-116.

Dickerson alleged disability based on post traumatic stress disorder (PTSD).  Tr. 135.  Dickerson

---

[1] While not determinative of issues before this Court, the undersigned notes that, during the administrative hearing,
the ALJ asked Dickerson's attorney whether Dickerson would amend the alleged onset date to the application filing
date but Dickerson declined to do so.  Tr. 32-36, 37-38.  Dickerson's attorney acknowledged that benefits could not
be awarded for a period earlier than the application date (Tr. 34) but she indicated that she did not want to amend the
alleged onset date because that is the date that Dickerson claimed he became disabled and Dickerson wanted the
ALJ to consider the fact that he had previously been awarded benefits and that those benefits were not terminated
based on medical improvement but due to his incarceration.  Tr. 37.

had a prior disability claim allowed on February 24, 2003.  Tr. 131.  The benefits were

terminated in August 2003 due to Dickerson's incarceration.  Tr. 33.  After his application was

denied initially and upon reconsideration (Tr. 73-75, 83-85), Dickerson requested a hearing (Tr.

86) and an administrative hearing was held before Administrative Law Judge Kurt G. Ehrman

("ALJ"), via videoconference, on April 6, 2011.  Tr. 24-70.

In his May 6, 2011, decision (Tr. 8-23), the ALJ determined that Dickerson had not been

under a disability from August 21, 2009, the date of the application, through the date of the

ALJ's decision.  Tr. 19.  Dickerson requested review of the ALJ's decision by the Appeals

Council.  Tr. 6.  On November 23, 2011, the Appeals Council denied Dickerson's request for

review, making the ALJ's decision the final decision of the Commissioner.  Tr. 1-5.

## II. Evidence

### A.      Personal and Vocational Evidence

Dickerson was born on September 20, 1950.  Tr.  114.  He completed his GED and

obtained an Associates Art Degree while incarcerated.  Tr. 40, 450.   He is a Vietnam veteran.

Tr. 30, 197.  He was convicted of, and served time for, murder, drugs and, most recently, armed

robbery.  Tr. 30, 197, 451.   He was most recently released from prison on August 11, 2009.  Tr.

197.  He did manual labor in factories from about 1992 through 2002.  Tr. 41, 57-61, 136.

### B.      Medical Evidence

#### 1.      Treatment records

Dickerson has a history of alcohol and drug abuse.  Tr. 339.  In 1984, Dickerson suffered

a gunshot wound to his back and legs.  Tr. 43.  Dickerson's physicians did not recommend

physical therapy nor did he receive physical therapy.  Tr. 43-44.  He also has not received

injection therapy.  Tr.  44.  While incarcerated, Dickerson had at least three x-rays taken.  Tr.

214, 239-240.  On February 9, 2006, he had a negative chest x-ray.  Tr. 214.  On July 31, 2007, a lumbar spine x-ray was taken showing "[d]iffuse chronic degenerative changes with hypertrophic spurring.  No acute abnormality."  Tr. 240.   Also, post surgical changes were seen in the right lower quadrant with small residual metallic densities possibly from a prior gunshot wound.  Tr. 240.  On April 4, 2008, an elbow x-ray was taken showing a possible fractured enthesophyte at the distal attachment of the triceps tendon.  Tr. 239.   After his release from prison, on December 9, 2010, Dickerson had a bilateral hip x-ray taken showing "mild sclerosis of each acetabulum."  Tr. 352-353.

On August 11, 2009, upon release from prison, Dickerson was provided with a two week supply of medication; his discharge summary noted that he had been receiving psychiatric treatment while incarcerated.  Tr. 214.  He went to the Department of Veterans Affairs emergency room on August 20, 2009, requesting refills of his medication and a primary care physician referral.  Tr. 180-182, 202-204.   He was pleasant and appropriate during his visit.  Tr. 203.  He did not report pain.  Tr. 204.  The emergency room providers refilled all of his medication except his psychiatric medications and referred him to the outpatient mental health clinic.  Tr. 202-203.

On August 31, 2009, Dr. Seong S. Shim conducted a psychiatric assessment of Dickerson.  Tr. 197-198.  Dr. Shim indicated that Dickerson was a Vietnam veteran with previous diagnoses of PTSD and substance abuse.  Tr. 197.  While in Vietnam, he was electrocuted when a rocket hit a pole he was working on and he has experienced PTSD ever since.  Tr. 197.  Dickerson reported that he was stable without clinically active PTSD.  Tr. 197. Dickerson had no specific features of PTSD that significantly interfered with his daily functioning.  Tr. 197.  On examination, Dickerson was ". . . relaxed, affect is broad and stable,

admits to some PTSD features, and depressed mood, denies any major mental disorders, denies

any violent ideation."  Tr. 198.  Dr. Shim diagnosed Dickerson with PTSD-stable, depression

NOS and ruled out antisocial personality.  Tr. 198.  He assigned Dickerson a GAF score of 65.[2]

Tr. 198.  Dr. Shim's recommended treatment plan was for Dickerson to continue his current

medication and return in two months.  Tr. 198.

Beginning in October 2009, Dickerson started to attend mental health group counseling

sessions through the VA.  Tr. 196, 271-272, 281-282, 286, 296.  During an October 9, 2009,

primary care visit with Dr. Jamie Eisen, M.D., Dickerson reported no pain.  Tr. 193.  Dr. Eisen

noted that Dickerson had no edema and did not look sick.  Tr. 192.  Dr. Eisen advised Dickerson

to diet and lose weight but he rejected a referral to a weight loss program.  Tr. 192, 195.  She

explained that his blood pressure was elevated and there were some complications because he

had not taken his medication that morning.  Tr. 192.  She advised Dickerson to follow up within

six months and also noted that Dickerson was receiving mental health treatment.  Tr. 192.

On October 28, 2009, Dickerson saw psychiatrist Catherine A. Nageotte, M.D.  Tr. 293-

295.  He again reported no pain.  Tr. 294.  He was at the appointment to receive refills on his

medication and denied any side effects.  Tr. 294.  Dr. Nageotte reported that Dickerson's affect

was pleasant, he was cooperative, and he denied any suicidal or homicidal ideation.  Tr. 294.

She indicated that he is a "chronic, low risk of harm to others in that he's commited [sic] murder,

armed robbery and drug trafficking."  Tr. 294.  She diagnosed Dickerson with dysthymic

---

[2] GAF considers psychological, social and occupational functioning on a hypothetical continuum of mental health
illnesses.  *See* American Psychiatric Association: *Diagnostic & Statistical Manual of Mental Health Disorders*,
Fourth Edition, Text Revision.  Washington, DC, American Psychiatric Association, 2000 ("DSM-IV-TR"), at 34.
A GAF score between 61 and 70 indicates "some mild symptoms (e.g., depressed mood and mild insomnia) or some
difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but
generally functioning pretty well, has some meaningful interpersonal relationships."  *Id.*

disorder and antisocial personality disorder.  Tr. 294.  She assigned Dickerson a GAF score of 50.[3]  Tr. 294.

On November 2, 2009, social worker Victoria M. Marion conducted a psychological assessment.  Tr. 286-292.   Ms. Marion indicated that Dickerson's presenting problems were homelessness, income and employment.  Tr. 286-287.  He reported no physical limitations.  Tr. 287.  During the 30 days prior to his assessment, he reported experiencing serious depression, anxiety and tension but he also reported that he had not experienced hallucinations, trouble understanding, concentrating or remembering, trouble controlling violent behavior, or serious thoughts of suicide and he had not attempted suicide.  Tr. 290.   On November 10, 2009, Dickerson again met with Ms. Marion for a mental health counseling session wherein they discussed possible employment options.  Tr. 285-286.  During a November 12, 2009, assessment, Ms. Marion assessed Dickerson with PTSD, antisocial personality disorder, hypertension, and diabetes and assessed Dickerson with a GAF score of 54.  Tr. 284.  Ms. Marion noted that Dickerson's problem was a lack of income and recommended that Dickerson obtain a vocational assessment.  Tr. 284.

On December 7, 2009, Dickerson saw nurse practitioner student Ann Conrad and nurse practitioner Anne Rusterholtz.  Tr. 276.  On physical exam, Dickerson was in no apparent distress.  Tr. 274.  He reported occasional pain but also indicated that he did not treat the pain and the pain eventually goes away.  Tr. 274.  Also, at the visit, his reported pain level was zero.  Tr. 275.  Conrad and Rusterholtz assessed Dickerson with hypertension that was not well

---

[3] A GAF score between 41 and 50 indicates "serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., few friends, unable to keep a job)." DSM-IV-TR at 34.

controlled and advised him to have his blood pressure and labs checked in four weeks and to
return in two months for a routine follow up.  Tr. 275-276.

As of January 2010, Dickerson had been working for a number of weeks as a janitor
through a job training program.  Tr. 251, 267-270.  During January 2010, he discussed with his
mental health providers the possibility of alternative living arrangements at another location
because he had been having verbal disagreements with his dorm mates.  Tr. 267-270.  Although
he reported that his living situation was volatile, during a January 7, 2010, visit with Dr.
Nageotte, he appeared pleasant, cooperative, and talkative, and his thought process was logical
and goal directed.  Tr. 267.  He recognized that he had a lot to lose if he did not remain violence
free.  Tr. 267.  Also, during medical visits on January 7, 2010, his blood pressure was elevated
but he reported a pain level of zero.  Tr. 266, 268.

On January 12, 2010, mental health provider Keith Moody visited Plaintiff at his
residence and Plaintiff informed Mr. Moody that he was continuing to have problems with his
living arrangements. Tr. 262.  Mr. Moody suggested another facility but Dickerson declined the
offer to move.  Tr. 261-262.  He indicated that he was determined to live at his residence without
further controversy and had already "made peace with the vet that he had had issues with."  Tr.
261.  On January 28, 2010, by reacting in a non-confrontational manner to a complaint about his
DVD use, he further demonstrated his commitment to avoid controversy.  Tr. 256.

On February 5, 2010, Dickerson reported a pain level of 6.  Tr. 255.  He reported that his
pain was generally joint pain and began in 2007.  Tr. 255.  He also reported that his pain "comes
and goes" and that his pain decreases with "changing position, heat, cold" and increases with
"changing position, exercise, walking."  Tr. 255.  He stated that his pain interferes with work,
concentration, physical activity, sleep, emotions, relationship with others, appetite, sexual

relations, enjoyment of life, caring for himself and affects his mental health.  Tr. 255.  He reported that his medication was helping some and he denied any medication side effects but he did indicate that he was still not sleeping well.  Tr. 253-254.  He was matter of fact and friendly and his thought process was logical and goal directed.  Tr. 254.

On February 10, 2012, Dickerson started working with social workers to begin the process to obtain a Housing Choice Voucher, which would allow him to seek his own housing.  Tr. 251-252.  On April 2, 2010, Dickerson reported that he had obtained his own housing and was still working through the job training program.  Tr. 514.  Dickerson had experienced some problems with setting up direct deposit for his paycheck but the issues were resolved and Dickerson was working with a social worker to get a bus pass.  Tr. 514.  He reported having food and that his rent was paid.  Tr. 514.

On April 16, 2010, Dickerson saw both a licensed practical nurse ("LPN") and Dr. Eisen and spoke with social worker Patricia Scott.  Tr. 508-513.  He reported conflicting information regarding his pain level; he first reported a pain level of 7 to the LPN and then reported a change in his pain level causing to Dr. Eisen to enter a pain level of zero.  Tr. 510, 511-512.  Dr. Eisen also indicated that Dickerson did not look sick.  Tr. 512.  Dr. Eisen advised Dickerson that his blood pressure was again elevated and that he should work on weight loss.  Tr. 512.

During his April 16, 2010, conversation with Ms. Scott, he reported an incident that had occurred at his housing unit involving an altercation with another resident who had taken some of his things.  Tr. 508.  He advised Ms. Scott that he was concerned that the resident was going to cause him to lose his housing voucher and/or be arrested.  Tr. 508.  Ms. Scott reminded Dickerson of all the improvement he had made and suggested that he focus on letting go his anger and Dickerson appeared to understand her suggestion and acknowledged that he "learned a

lesson he will never forget." Tr. 508.  During a follow up conversation on April 19, 2010, Dickerson reported to Ms. Scott that he had spoken with the leasing manager regarding the incident with the other resident and the matter had been resolved to all parties' satisfaction.  Tr. 507.  Ms. Scott continued to provide assistance to Dickerson regarding his check that had not been deposited correctly into his bank account and in obtaining another bus pass while he was awaiting receipt of the rerouted check.  Tr. 507.  When Ms. Scott visited Dickerson his apartment was clean and well kept.  Tr. 504.

After missing a May 14, 2010, appointment with Dr. Nageotte, Dickerson saw Dr. Nageotte on May 20, 2010.  Tr. 500-502.  Dickerson reported some non-physical altercations with others.  Tr. 501.  He requested a change in medication because he believed that some medications were causing sexual dysfunction.  Tr. 501.  He reported that one of his medications was helping him sleep a little better but it was not making him as calm as he would like.  Tr. 501.  He tested positive on April 16, 2010, for cocaine use and, while he first denied use, he later admitted using.  Tr. 501.  He also reported alcohol use as well which Dr. Nageotte indicated could and usually does cause sleep problems.  Tr. 501.  Dr. Nageotte reported that Dickerson was pleasant, matter of fact and cooperative.  Tr. 501.  He had a normal gait.  Tr. 501.  His thought process was logical and goal oriented and he denied hallucinations.  Tr. 501.  He was advised to return in one month for medication monitoring.  Tr. 502.

On June 14, 2010, following her receipt of a telephone message from Dickerson regarding problems that he was having with security personnel at his housing unit, Ms. Scott attempted to reach Dickerson but his phone was disconnected.  Tr. 498.  She noted that Dickerson has anger management issues and tends to react to authority figures in a

confrontational manner when there are complaints against him.  Tr. 498.  She indicated that she would give him time to cool off and would try to reach him at the end of the week.  Tr. 498.

On June 22, 2010, Dickerson lost his job because he was not reporting to work.  Tr. 497-498.  Following his termination, he began to experience boredom.  Tr. 495-496.  The manager at the housing unit where Dickerson was residing periodically gave Dickerson small jobs in the building to make some money.  Tr. 495.  Dickerson would become angry if there was no work for him.  Tr. 495.

On November 3, 2010, Dickerson went to the emergency room because of elevated blood pressure, headaches and chest pains but he left against medical advice because he stated he had personal issues to take care of.  Tr. 484.  He followed up with his doctor on November 4, 2010.  Tr. 488.  He reported that he had been without medication for a month due to a lack of money.  Tr. 488.  He reported having intermittent chest pains for the past 2-3 years and, more recently, having chest pains 2-3 times per week.  Tr. 488.  He also reported having problems with his vision for about the past 2-3 months.  Tr. 488.  He reported using cocaine 2-3 times per month and regular drinking.  Tr. 488.  On physical examination, Dickerson had trace edema in his extremities but full strength and his gait was within normal limits.  Tr. 488.  He reported no pain.  Tr. 482.  Again, against medical advice, Dickerson left the appointment without seeking the recommended medical emergency room treatment.  Tr. 474-493.

On November 11, 2010, Dickerson was back at the emergency room seeking medical care for chest pains.  Tr. 462-473.  Dickerson was in no acute distress and there was no cyanosis, clubbing or edema present.  Tr. 467.  He reported a pain level of zero and did not show signs of gait or balance abnormality.  Tr. 471-472.  His chest x-ray was normal.  Tr. 353.  He was discharged the same day. Tr. 462.

In November and December of 2010, social workers worked with Dickerson to find resources to assist him with rent and employment.  Tr. 450-462.  Dickerson was open to exploring his options.  Tr. 461.  He indicated that, on an as needed basis, he performed work in his apartment building such as painting and cleaning.  Tr. 455.

On December 6, 2010, Dickerson completed a vocational assessment/evaluation with Bruce E. Locey, a rehabilitation counselor.  Tr. 450-454.  Dickerson reported that he had no physical limitations and pain level of zero when at rest and when active.  Tr. 451.  When asked, what, if any, physical limitations or restrictions he had, Dickerson reported "[n]one that I'm aware of."  Tr. 451.  He indicated that he has had problems with anger management and he deals with it by counting to 10 or removing himself from the situation.  Tr. 452.  He reported that his "skills" included "networking, in-person contact."  Tr. 452.  Dickerson noted that his barrier to employment was his "legal history."  Tr. 453.  Mr. Locey indicated that Dickerson had a genuine desire to work competitively but concurred with Dickerson when he noted that a barrier to employment was his legal history.  Tr. 453-454.  Mr. Locey informed Dickerson that CWT (Compensated Work Therapy) admissions were based on a team decision and his request would be submitted to the team for consideration.[4]  Tr. 454.  Dickerson informed social worker Patricia Scott that his admission to the CWT program was dependent upon medical clearance and that he had a doctor's appointment scheduled for December 9, 2010.  Tr. 449.

Upon Dr. Eisen's advice, on December 9, 2010, Dickerson went to the emergency room for chest pains.  Tr. 429-449.  Dickerson reported both chest pain and hip pain.  Tr. 431.  However, Dickerson exhibited no signs of gait or balance abnormality.  Tr. 430.  A bilateral hip x-ray showed mild sclerosis of each acetabulum.  Tr. 352-353, 440.  Notwithstanding the

---

[4] The goal of CWT is full-time competitive employment.  Tr. 393-394.

emergency room physician's recommendation that Dickerson be admitted, Dickerson refused admission.  Tr. 440.  He indicated that, if the chest pain got worse or occurred more frequently, he would return to the emergency room.  Tr. 440-441.  Conservative treatment, i.e., Tylenol, was recommended for Dickerson's hip pain along with a recommendation that he follow up with his primary care physician.  Tr. 441.

On December 21, 2010, Dr. Eisen indicated that, until Dickerson's chest pain was clarified by cardiology, he was not medically cleared for admission to the CWT program.  Tr. 428.  On December 23, 2010, Dickerson attended a cardiology appointment and reported that he had been active since his December 9, 2010, medical appointments and had not had chest pain since that date.  Tr. 426.  The cardiologist ordered a chest echocardiogram and exercise stress test to rule out ischemia.  Tr. 427.  On February 4, 2011, the cardiac stress test was negative for myocardial ischemia at a moderate-high workload.  Tr. 417-422.  The test was positive for hypertension with a note that Dickerson had run out of his blood pressure medication and had had trouble getting a refill.  Tr. 422.   During a follow up appointment on February 17, 2011, with Dr. Phillip Anderson, Dickerson indicated that, since his stress test was "ok," he wanted a CWT consult as well as an occupational therapy referral for "something to do."  Tr. 411-412.  In requesting the CWT consult, Dr. Anderson indicated that Dickerson's stress test was normal and that he was medically and physically stable; he did not have any acute medical or psychiatric problems that would interfere with his ability to work.  Tr.  364.

### 2.     State Agency Reviewing Physicians

#### a.     Kristen Haskins, Psy. D.

On November 23, 2009, state agency reviewing physician Kristen Haskins reviewed Dickerson's records and was unable to complete an assessment because she found that there was

insufficient evidence to evaluate his mental impairment.  Tr. 325.  She noted that neither

claimant nor a third party responded to phone calls or call-in letters to give information regarding

activities of daily living.[5]  Tr. 337.

       **b.**      **Karen Steiger, Ph.D.**

On March 2, 2010, having received medical evidence of record from the VA hospital and

responses regarding Dickerson's activities of daily living, state agency reviewing physician

Karen Steiger completed a Psychiatric Review Technique and Mental RFC.  Tr. 307-324.  The

Psychiatric Review Technique reflects that Dr. Steiger diagnosed Dickerson with dysthymic

disorder; anxiety related to recurrent and intrusive recollections of traumatic experience; and

antisocial personality disorder.  Tr. 314, 316, 318.  Dr. Steiger opined that Dickerson had no

restrictions in activities of daily living; mild limitations in maintaining concentration, persistence

and pace; moderate limitations in social functioning; and no episodes of decompensation.  Tr.

321.

In the Mental RFC, Dr. Steiger noted that there was no treating source statement as to

Dickerson's functional limitations.  Tr. 309.  She rated Dickerson as either having no significant

limitations or no limitations in 16 of the 20 rated categories and as having moderate limitations

in 4 categories: ability to sustain an ordinary routine without special supervision; ability to

interact appropriately with the general public; ability to maintain socially appropriate behavior

and to adhere to basic standards of neatness and cleanliness; and ability to set realistic goals or

make plans independently of others.  Tr. 307-308.  She indicated that his PTSD was supported

by the VA records and he had diagnoses of dysthymia and personality disorder.  Tr. 309.  She

opined that Dickerson is capable of learning, remembering and performing routine work tasks in

---

[5] There is no indication in the report as to whom Dr. Haskins was referring when she mentioned a "third party" not responding.  Tr. 337.

settings that allow him to work without much interaction with others and he can function in a workplace that has a stable routine.  Tr. 310.

## C.    Testimonial Evidence

### 1.    Dickerson's Testimony

Dickerson testified at the hearing with counsel present.  Tr. 36-69.  He testified about his recurring drug and alcohol abuse.  Tr. 38-39.  He lives on his own and maintains a two bedroom, two bathroom apartment.  Tr. 51-52.  Because of his financial situation, with the assistance of a case manager, he filed for and received a hardship waiver from HUD and does not pay rent.  Tr. 52.  He spends his day going to doctor appointments, meeting with his case manager, shopping, and taking care of his apartment.  Tr. 53-54.  Dickerson uses public transportation.  Tr. 53-54.

He does not get along with others and does not have the patience or willingness to do so.  Tr. 41, 49-51.  He has problems interacting with authority figures.  Tr. 50.  He has been involved in physical altercations with others.  Tr. 50-51.  His mind wanders and he has problems concentrating.  Tr. 51.

His past employment involved heavy lifting but, because of being shot in the back, he is no longer able to do such work.  Tr. 41.  He indicated that his back will go out on him from time-to-time and he cannot stand for more than a half hour without having to take a break to sit.  Tr. 41, 47-48.  The maximum amount of time that he can stand in a day, if given a chance to sit or stand, is 3 hours.  Tr. 55.  Dickerson experiences pain in his back and legs on a daily basis.  Tr. 46-47.  His level of pain is dependent upon how much he has been moving around.  Tr. 46-47.  Because of his history of drug abuse, he does not take prescription medication for pain but does take Tylenol.  Tr. 42.  He has not had physical therapy.  Tr. 44.  He testified that, with breaks, he can lift about 20 pounds.  Tr. 45.  Dickerson mentioned having arthritis in his hands but, because

there was no diagnosis of arthritis, the ALJ did not permit additional testimony on the subject. Tr. 45.  As a result of his hypertension, Dickerson's feet sometimes swell.  Tr. 46.

At the conclusion of the hearing, Dickerson acknowledged that his own criminal history was an impediment to finding employment.  Tr. 68.

### 2.    Vocational Expert's Testimony

Vocational Expert Nancy Borgeson ("VE") testified at the hearing.  Tr. 56-69.  The ALJ asked the VE whether there would be jobs in the national and regional economy for a hypothetical individual of the same age, education and work experience as Dickerson who can lift no more than 50 pounds occasionally and lift and carry up to 25 pounds frequently; can occasionally climb ladders, ropes and scaffolds; can frequently climb ramp and stairs; can frequently balance, stoop, kneel, crouch and crawl; is limited in ability to understand, remember and carry out simple instructions and in ability to make judgments on work-related decisions; is limited to only occasional superficial interaction with the general public and limited to occasional interaction with coworkers.  Tr. 61-62.  The VE indicated that such an individual could perform medium-unskilled work as a hand packer or hand packager, kitchen helper (including dishwasher) and industrial cleaner.  Tr. 62.

The VE testified that, if such an individual was also limited to work that is free of fast-paced production or strict quota requirements, involving only simple work-related decisions and routine work changes, the jobs previously identified by the VE would be available to such an individual.  Tr. 62-63.  However, if such an individual was going to be off task 20 percent of the time; or absent from work 2 or more days per month; or unable to sustain work activity on a regular, continuing basis for 8 hours a day, 5 days a week, 40 hours a week there would be no full-time competitive work available.  Tr. 63.

Dickerson's counsel questioned the VE about the training periods involved with the indentified jobs.  Tr. 63-66.  The VE testified that, for unskilled jobs, the DOT allows for up to 30 days for training.  Tr. 63.  The VE clarified that, while the DOT allows for up to 30 days for training, all jobs do not require 30 days and some only require a short demonstration.  Tr. 64, 67.  Dickerson's counsel asked the VE whether "[i]f an individual was unable to have more than occasional superficial interaction with coworkers, supervisors, the general public, would they be capable of surviving the training period."  Tr. 66.  Counsel clarified that her question was asking whether or not someone who is unable to have more than occasional superficial interaction with "others, anyone" would have difficulty surviving the training period.  Tr. 66.  The VE testified that such an individual would be unable to sustain the jobs.  Tr.  66.

### III. Standard for Disability

Under the Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations.  The five steps can be summarized as follows:

1.    If the claimant is doing substantial gainful activity, he is not disabled.

2.    If claimant is not doing substantial gainful activity, his impairment must
      be severe before he can be found to be disabled.

3.    If claimant is not doing substantial gainful activity, is suffering from a
      severe impairment that has lasted or is expected to last for a continuous
      period of at least twelve months, and his impairment meets or equals a
      listed impairment, claimant is presumed disabled without further inquiry.

4.    If the impairment does not meet or equal a listed impairment, the ALJ
      must assess the claimant's residual functional capacity and use it to
      determine if claimant's impairment prevents him from doing past relevant
      work.  If claimant's impairment does not prevent him from doing his past
      relevant work, he is not disabled.

5.    If claimant is unable to perform past relevant work, he is not disabled if,
      based on his vocational factors and residual functional capacity, he is
      capable of performing other work that exists in significant numbers in the
      national economy.

20 C.F.R. § 416.920; *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42, 96 L. Ed. 2d 119, 107 S.

Ct. 2287 (1987).  Under this sequential analysis, the claimant has the burden of proof at Steps

One through Four.  *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The

burden shifts to the Commissioner at Step Five to establish whether the claimant has the

Residual Functional Capacity ("RFC") and vocational factors to perform work available in the

national economy.  *Id.*

## IV. The ALJ's Decision

In his May 6, 2011, decision, the ALJ made the following findings:

1.    Dickerson had not engaged in substantial gainful activity since August
      21, 2009, the application date. Tr. 13.

2.    Dickerson has the following severe impairments: PTSD; dysthymia; and
      a personality disorder.  Tr. 13.  Dickerson has non-severe impairments
      including sclerosis of the hips; diffuse chronic degenerative changes in
      his spine; chronic obstructive pulmonary disease (COPD); and hepatitis
      C.  Tr. 13-14.

3.      Dickerson does not have an impairment or combination of impairments that meet or medically equal one of the listed impairments.[6]  Tr. 14-16.

4.      Dickerson has the residual functional capacity ("RFC") to perform medium work except occasionally climb ladders, ropes and scaffolds, and frequently climb ramps or stairs, balance, stoop, kneel, crouch and crawl; he is able to understand, remember, and carry out simple instructions and to make judgments on simple work related decisions;  he is limited to simple, routine and repetitive tasks performed in a work environment free of fast-paced production requirements involving only simple work related decisions and routine work place changes; he can have at most occasional and superficial interaction with the public and at most occasional interaction with co-workers. Tr. 16-18.

5.      Dickerson is unable to perform any past relevant work.  Tr. 18.

6.      Dickerson was born on September 20, 1950, and was 58 years old, which is defined as an individual closely approaching retirement age, on the date the application was filed.  Tr. 18.

7.      Transferability of job skills is not material to the determination of disability.  Tr. 18.

8.      Dickerson is capable of performing jobs that exist in significant numbers in the national economy: hand packager, kitchen helper and industrial cleaner.  Tr. 18-19.

Based on the foregoing, the ALJ determined that Dickerson had not been under a disability from August 21, 2009, the date the application was filed. Tr. 19.

## V. Parties' Arguments

### A.      Plaintiff's Arguments

First, Dickerson argues that the ALJ's decision is not supported by substantial evidence because the ALJ did not fully and fairly evaluate his complaints of pain.  Doc. 15, pp. 10-12.

Dickerson asserts that he presented evidence of medical impairments that reasonably limited him

---

[6] The Listing of Impairments (commonly referred to as Listing or Listings) is found in 20 C.F.R. pt. 404, Subpt. P, App. 1, and describes impairments for each of the major body systems that the Social Security Administration considers to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience.  20 C.F.R. § 404.1525.

to light duty work activity and such a finding would direct a conclusion of "disabled" under the Medical Vocational Guidelines.[7]  Doc. 15, pp. 10-12.

Second, Dickerson argues that the ALJ's decision is not supported by substantial evidence because the ALJ improperly relied on VE testimony in response to a hypothetical that was based on a faulty RFC.  Doc. 15, pp. 12-14.  Plaintiff asserts that, although the ALJ gave significant weight to state agency reviewing physician Dr. Steiger's opinion, the ALJ, in the RFC, did not adequately address Dr. Steiger's stated limitations on Dickerson's ability to interact with others because he did not limit Dickerson's interaction with supervisors and only limited his interaction with others to occasional interaction.  Doc. 15, pp. 12-13.  Plaintiff also argues that the VE's testimony regarding the amount of interaction required to adequately survive training for an unskilled job demonstrates that the ALJ's decision is not supported by substantial evidence.  Doc. 15, pp. 14-15.

**B.      Defendant's Arguments**

In response, the Commissioner argues that the ALJ conducted a proper credibility analysis by considering Plaintiff's subjective complaints of back and hip pain along with the factors outlined in Social Security Ruling 96-7p.  Doc. 16, pp. 13-14. Further, the Commissioner argues that the ALJ's findings that Plaintiff's complaints of pain were less than fully credible and that Plaintiff has greater functional capacity than he alleges are supported by substantial evidence.  Doc. 16, pp. 13-14.

The Commissioner also argues that, as required by the Regulations, the ALJ accounted for all the functional limitations that the ALJ determined were supported by the record.  Doc. 16, pp. 16-18.  The Commissioner asserts that functional limitations contained in the training

---

[7] Medical Vocational Guidelines (also known as the "Grid") are found in Title 20 of the Code of Federal Regulations Part 404, Subpart P, Appendix 2.

hypothetical that the Plaintiff argues should have been adopted by the ALJ are not supported by the record.  Doc. 19-20.  Thus, the Commissioner argues that, because the VE hypothetical relied upon by the ALJ accurately reflects Plaintiff's limitations, the ALJ's reliance upon the VE's testimony in response thereto was proper and constitutes substantial evidence.  Doc. 16, p. 20.

## VI. Law & Analysis

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992).  A court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

**A.    The ALJ properly assessed Dickerson's credibility.**

Social Security Ruling 96–7p and 20 C.F.R. § 416.929 describe a two-part process for assessing the credibility of an individual's subjective statements about his or her symptoms.  First, the ALJ must determine whether a claimant has a medically determinable physical or mental impairment that can reasonably be expected to produce the symptoms alleged; then the ALJ must evaluate the intensity and persistence associated with those symptoms to determine how those symptoms limit a claimant's ability to work.   When evaluating the intensity and persistence of a claimant's symptoms, consideration is given to objective medical evidence and other evidence, including: (1) daily activities; (2) the location, duration, frequency, and intensity of pain or other symptoms; (3) precipitating and aggravating factors; (4) the type, dosage,

effectiveness, and side effects of any medication taken to alleviate pain or other symptoms; (5)

treatment, other than medication, received for relief of pain or other symptoms; (6) any measures

used to relieve pain or other symptoms; and (7) other factors concerning functional limitations

and restrictions due to pain or other symptoms.  20 C.F.R. § 416.929(c); Soc. Sec. Rul. 96–7p,

1996 SSR LEXIS 4, at *5–8 (1996).  "[A]n ALJ's findings based on the credibility of the

applicant are to be accorded great weight and deference, particularly since an ALJ is charged

with the duty of observing a witness's demeanor and credibility.  Nevertheless, an ALJ's

assessment of a claimant's credibility must be supported by substantial evidence."  Calvin v.

Comm'r of Soc. Sec., 437 F. App'x 370, 371 (6th Cir. 2011) (citing Walters v. Comm'r of Soc.

Sec., 127 F.3d 525, 531 (6th Cir.1997)).

        After considering the entire case record and conducting a thorough credibility analysis,

the ALJ determined that Dickerson's allegations were generally not credible and the ALJ gave

them little weight.  Tr. 13-18.  In reaching this conclusion, the ALJ considered Dickerson's daily

activities and his allegations that his impairments caused severe limitations.  Tr. 17.  The ALJ

ultimately determined that the objective medical record did not support the severe limitations

alleged by Dickerson.  Tr. 17.   In support of his findings, the ALJ considered Dickerson's daily

activities.  Tr. 17.  He also noted that, during a medical consult, Dickerson denied having any

physical limitations that prevented him from working.  Tr. 17, 451, 650.  Further, Dickerson's

own testimony revealed no physical therapy.  Tr. 13-14, 44.  Dickerson argues that the fact that

he did not receive treatment for his pain does not diminish the reasonableness of his complaints

of pain.  Doc. 15, p. 11.  However, as provided for in the Regulations, treatment received is a

factor that an ALJ may consider when assessing a claimant's credibility. 20 C.F.R. § 416.929(c);

Soc. Sec. Rul. 96–7p, 1996 SSR LEXIS 4, at *5–8 (1996).  Moreover, medical records reveal repeated reports of no pain.  Tr. 193, 204, 294, 482.

Dickerson also relies on his own testimony and two x-rays to argue that there is sufficient evidence to find Dickerson's complaints of pain reasonable.  Doc. 15, p. 11.  However, a claimant's statements about his pain or other symptoms will not alone establish that a claimant is disabled.  20 C.F.R. § 416.929(a).  Furthermore, the ALJ did consider Dickerson's December 9, 2010 (hip) (Tr. 440), and July 31, 2007 (lumbar spine) (Tr. 240), x-rays.  Tr. 13-14.  In doing so, he considered the x-rays in light of the fact that there was a lack of treatment history and in light of the fact that no doctor had assessed any specific functional limitations for those non-severe impairments.  Tr. 13-14.

The ALJ is charged with assessing credibility and an ALJ's credibility assessment is to be accorded great weight and deference.  Having reviewed the ALJ's decision, the undersigned finds that the ALJ's thoroughly reasoned credibility analysis regarding Dickerson's complaints of pain is supported by substantial evidence.  Thus, the ALJ's credibility assessment is not a basis for reversal.

**B.     The ALJ's Step Five determination is supported by substantial evidence.**

Dickerson argues that, although the ALJ gave significant weight to Dr. Steiger's opinion, the ALJ did not adequately incorporate Dr. Steiger's opinions regarding Dickerson's ability to interact with others into the RFC.  Doc. 15, pp. 12-13.  Dickerson also relies upon the VE's response to a hypothetical question posed by his counsel, which was not adopted by the ALJ, regarding the ability of an individual to complete the training period for an unskilled job if such an individual was unable to have more than occasional superficial interaction with coworkers, supervisors, and the general public to support his argument that the ALJ's finding that Dickerson

can perform a significant number of jobs is not supported by substantial evidence.  Doc. 15, pp. 13-14.

The regulations make clear that a claimant's RFC is an issue reserved to the Commissioner and the ALJ assesses a claimant's RFC "based on all of the relevant medical and other evidence" of record.  20 C.F.R. §§ 416.945(a)(3); 416.946(c), *see also Coldiron v. Comm'r of Soc. Sec.*, 391 Fed. Appx. 435, 439 (6th Cir. 2010) ("The Social Security Act instructs that the ALJ – not a physician – ultimately determines a Plaintiff's RFC"); *Poe v. Comm'r of Soc. Sec.*, 342 Fed. Appx. 149, 157 (6th Cir. 2009) ("an ALJ does not improperly assume the role of a medical expert by assessing the medical and non-medical evidence before rendering a residual functional capacity finding").  "Hypothetical questions . . .  need only incorporate those limitations which the ALJ has accepted as credible."  *Parks v. Social Sec. Admin.*, 413 Fed. Appx. 856, 865 (6th Cir. 2011) (citing *Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993)).

Dr. Steiger opined that Dickerson could work in a setting that allows him "to work without much interaction with others."  Tr. 309.  The ALJ's RFC and hypothetical to the VE, which limit Dickerson to "at most occasional and superficial interaction with the public and at most occasional interaction with co-workers," are consistent with Dr. Steiger's opinion and the evidence as a whole.  Tr. 16.  As indicated by the ALJ and as reflected in the record, Dickerson does have the ability to interact with others.  Tr. 15, 254, 256, 261, 267.  While Dickerson argues for a different RFC and argues that the ALJ should have relied upon his counsel's hypothetical and the VE's response thereto to find Dickerson "disabled," the ALJ's RFC and corresponding VE hypothetical are supported by substantial evidence and the ALJ's reliance thereon to support

his finding of no disability was proper.  Accordingly, Dickerson's Step Five arguments are

without merit and not a basis for reversal.

## VII. Conclusion and Recommendation

For the foregoing reasons, it is recommended that the Commissioner's decision be

**AFFIRMED**.


Dated:   December 17, 2012

_____

Kathleen B. Burke
United States Magistrate Judge

## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of
Courts within fourteen (14) days after the party objecting has been served with a copy of this
Report and Recommendation.  Failure to file objections within the specified time may waive the
right to appeal the District Court's order.  See *United States v. Walters*, 638 F.2d 947 (6th Cir.
1981).  *See also Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).